WELCH, Judge.
The Jefferson County grand jury indicted David Lee Gaines on August 5, 2010, for two counts of capital murder. Count one charged Gaines with the intentional murder of Ericka Jean by shooting her with a pistol while she was inside a vehicle, see § 13A-5-40(a)(17), Ala.Code 1975. Count two charged Gaines with the intentional murder of Ericka Jean by shooting her with a pistol while he was inside a vehicle, a violation of § 13A-5^áO(a)(18), Ala.Code 1975. The State dismissed count two before trial.
The case was tried before a jury, and, on March 11, 2011, the jury convicted Gaines of the lesser-included offense of manslaughter. The trial court sentenced Gaines to 20 years in prison. Gaines now appeals.

FACTS

Gaines and Ericka Jean met approximately one year before Jean’s death. They began dating, and Jean and her two children moved into Gaines’s house. After Jean had moved into Gaines’s house, they began fighting. They argued because Gaines did not want to discipline Jean’s son, and they argued because Gaines often gave money to the mother of his son, when Jean thought he should spend the money on her children. Jean planned to leave Gaines and move into a shelter with her children.
On the night before Jean was killed, she and Gaines argued about money, specifically as it related to her children and Gaines’s son. The argument continued the next day. On that day, Shalicia Persons, the owner of the day-care center where Jean took her children, was in her car and stopped at a railroad crossing. Several cars were stopped behind her. Persons saw the man in one of the cars behind her and then heard gunshots — one before he got out of his car, and several after he got out of the car. Persons saw the man pointing the gun inside the car and firing. She recognized Gaines as the man shooting the gun, and she also recognized his car.
After shooting into the car, Gaines got back inside the car and closed the door. Persons turned her car around and got behind Gaines’s car. The train had *359 passed, and Persons and others inside her car were telephoning emergency 911.
An emergency-room nurse at St. Vincent’s Hospital, where Gaines drove himself and the victim after the shooting, testified that when Gaines arrived at the hospital’s emergency room, he signed in, said he had been shot in the right leg, and began undergoing treatment. He did not say anything about Jean until someone asked whether anyone was with him. Gaines responded by pointing toward the window and said that she was in the car and that she had been shot, too. The nurse immediately went out into the parking lot and found Jean, who was not moving or breathing.
The medical examiner testified that Jean had been shot six times. All but one of the gunshot wounds were to the back of her body and were fired from at least three feet away. Several of the gunshot wounds were fatal, and others would have paralyzed her.
Gaines testified on his own behalf at trial. According to Gaines, he argued with Jean about money, but he denied hitting or slapping her. Gaines said that when they were arguing he would grab her to keep her from attacking him. He said Jean was the violent one in their relationship. Although Jean had moved out of his house several times, she had always returned.
Gaines testified that on the day before the shooting, he and Jean were arguing because she was mad that he had given the mother of one of his children extra money. He said that they continued to argue the following day.
On the day of the shooting, Gaines was driving and had stopped his car at a railroad crossing waiting for a train to pass. Jean was in the front passenger seat. Gaines kept his gun on the driver’s side floorboard, in a holster and partially under the driver’s side floor mat. Gaines said that while they were stopped, he and Jean were arguing and Jean slapped him two times with her left hand. When she tried to slap him a third time, Gaines grabbed her hand and opened his door.
Then, Gaines testified, Jean tried to get the gun. According to Gaines, when he grabbed her hand with both of his hands, she fired the gun and a bullet struck his right leg. As they struggled over the gun, Jean fired it two more times.
When Gaines got the gun away from her, he fired as he was getting out of the driver’s side door. He said that he feared for his life after Jean shot him and acted in self-defense. Gaines testified that did not remember shooting into the car while he was standing outside the car.
Gaines did not telephone emergency 911 for an ambulance, and he did not drive to the nearest hospital; instead, he drove approximately 30 minutes to another hospital. When he arrived at that hospital, he did not immediately tell the hospital staff that the other shooting victim was outside in his car.

ANALYSIS

Gaines claims on appeal that the trial court committed reversible error by giving a jury instruction regarding self-defense that was incorrect, misleading, and prejudicial. Gaines asserts: (1) that the instruction improperly substituted the phrase “created the controversy” for the statutory term “initial aggressor,” and (2) that the instruction improperly stated that Gaines had a “duty to retreat.”
The trial court’s instruction on self-defense provided, in relevant part:
“The Defendant does not have the burden of proving that he acted in self defense. To the contrary, once the issue of self defense becomes an issue, the *360 State has the burden of proving that or prove beyond a reasonable doubt that the Defendant did not act under circumstances amounting to self defense. So in conclusion, to prevail in self defense— and there are three things. One, the Defendant must not have created the controversy. Now, when you think about it that makes sense, because it wouldn’t make sense if you could start a controversy and then say, oh, I killed this person in self defense; that wouldn’t make sense at all, would it? Okay. So the Defendant would not have created [the] controversy. Second, at the time of the shooting, the Defendant must have reasonably believed that his life or body was in danger of serious physical injury or death. Thirdly, the Defendant must retreat without using deadly force if he can do so safely.”
(R. 570-71.) (Emphasis added.)
Before the jury retired to deliberate, Gaines made the following objection to the self-defense instruction:
“Judge, relative to the instructions that the Court gave the jury, the Defendant takes exception to a portion of the self-defense charge that the Court gave. The Defendant believes that the law in Alabama uses the terminology, ‘aggressor,’ in that part of the instruction where it refers to a Defendant not being able to claim self defense if he or she were the initial aggressor. I think that’s the language that the law has in it. This Court used the language, ‘he must not have initiated the controversy.’
“The Defendant believes that those two things could mean something totally different especially in a circumstance like this where there is testimony of arguments over a course of time. This jury could easily believe that initiating the controversy may be about starting an argument, but it is clear when you say ‘the initial aggressor,’ you talk about one who is the first to cause or to act in a physical or violent way. And so, for that reason, I think the — we take exception to the instruction that you gave them, and we ask that you go back after lunch and let them — instruct them relative to the issue of him being or not being the initial aggressor.”
(R. 577-78.)
The trial court did not give an additional instruction to the jury on self-defense.
“ ‘A trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case.’ ” Toles v. State, 854 So.2d 1171, 1175 (Ala.Crim.App.2002), quoting Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App.1986). “A trial judge may explain to the jury the legal terms involved in his instructions where his explanation does not qualify, limit, or modify them.” Brackin v. State, 417 So.2d 602, 605 (Ala.Crim.App.1982). “While the better practice is to use the identical language of the statute, the judge need not precisely follow the statutory language in reading the law to the jury.” Id. at 604.
Alabama law defines self-defense in § 13A-3-23, Ala.Code 1975, which states, in relevant part:
“(a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose.
“(b) A person who is justified under subsection (a) in using physical force, including deadly physical force, and who is not engaged in an unlawful activity *361 and is in any place where he or she has the right to be has no duty to retreat and has the right to stand his or her ground.
“(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force if:
“(1) With intent to cause physical injury or death to another person, he or she provoked the use of unlawful physical force by such other person.
“(2) He or she was the initial aggressor, except that his or her use of physical force upon another person under the circumstances is justifiable if he or she withdraws from the encounter and effectively communicates to the other person his or her intent to do so, but the latter person nevertheless continues or threatens the use of unlawful physical force.”
(Emphasis added.)[1]
The circuit court’s instruction that self-defense was not available if the defendant “created the controversy” did not accurately reflect the law expressed in the statutory phrase requiring that the defendant not have been “the initial aggressor.” “Aggressor” is defined as “one that commits or practices aggression,” Merriam-Webster’s Collegiate Dictionary 25 (11th ed. 2003), and “aggression” is defined as “a forceful action or procedure (as an unprovoked attack) esp. when intended to dominate or master.” Id. at 24. “Controversy,” on the other hand, is defined as “a discussion marked esp. by the expression of opposing views: dispute.” Merriam-Webster’s Collegiate Dictionary 272 (11th ed. 2003). (Emphasis added.) The jury instruction given by the trial court vastly limited the scope of the statute, and it did not accurately reflect the legal principles governing self-defense. The charge was erroneous.
Furthermore, the circuit court’s improper self-defense instruction was not harmless. As Gaines argued at trial, and as he continues to argue on appeal, the instruction could have led the jury to reject Gaines’s defense of self-defense if the jury believed that Gaines “initiated the controversy” by starting an argument with Jean, even if the argument began in the days or weeks preceding the fatal shooting. The statute clearly indicates that self-defense is not available to the initial aggressor, but does not limit the defense to one who might have started an argument or controversy. Therefore, we cannot find that the error in the jury instruction was harmless, and we are compelled to reverse the circuit court’s judgment.
Because we are reversing the judgment for the reasons discussed above, we pre-termit discussion of Gaines’s other claim of error regarding the instruction on the duty to retreat.
For the foregoing reasons, the judgment of the circuit court is reversed, and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
WINDOM, P.J., and KELLUM, BURKE, and JOINER, JJ., concur.

. In Williams v. State, 46 So.3d 970, 971 (Ala.Crim.App.2010), this Court recognized that the amendment to § 13A-3-23(b), Ala. Code 1975, which removed from the defense of self-defense the duty to retreat and which allows an individual to stand one’s ground, became effective June 1, 2006.